IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 6, 2000 Session

## IN RE: ESTATE OF RALPH I. CAMMACK, DECEASED

**Appeal from the Chancery Court for Coffee County**
**No. PW-99-9    John W. Rollins, Chancellor**

---

**No. M1999-02382-COA-R3-CV - Filed November 9, 2000**

---

This is a dispute between the deceased testator's second wife and the two children of his first marriage. The testator and his wife executed mutual and reciprocal wills which passed the bulk of their estate to the survivor. The spouses agreed, and their wills reflected, that when the survivor died, the estate was to go equally to the testator's children. In conjunction with the wills, the spouses executed an agreement that they would not change their wills even after the death of the other. After the testator's death, the wife began dissipating the estate, selling the family home, and giving her own child the testator's expensive grandfather clock. In an effort to preserve the estate, the testator's children commenced the underlying action, seeking to establish a resulting trust. After the trial court granted the wife's motion for summary judgment, the testator's children lodged this appeal. Because testator's will gave the wife his estate in fee simple, she inherited the real property as tenant by entirety, and there is no clear and convincing evidence that the testator intended her merely to hold the property in trust for his children, we must affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Robert L. Huskey, Manchester, Tennessee, for the appellants, Polly Ann Cammack Travis and Fred Cammack.

Frank Van Cleave, Tullahoma, Tennessee, for the appellee, Molly M. Cammack, Personal Representative of the Estate of Ralph I. Cammack.

### OPINION

During his fifty year marriage to his first wife, Ralph I. Cammack ("the testator") acquired most of his estate. In the course of the marriage, the testator served in the armed forces and traveled extensively, acquiring many interesting items. The testator's first wife predeceased him. The

testator subsequently married the appellee herein, Mrs. Molly Cammack. This marriage produced no children, although both the testator and his second wife had children from their previous marriages.

On May 12, 1994, the testator and Mrs. Cammack executed mutual and reciprocal wills which passed the bulk of their estate to the survivor. Upon the death of the survivor, both wills left the estate to the testator's two children. In conjunction with the wills the spouses entered into a contract in which Mrs. Cammack agreed not to change her will should the testator predecease her. The contract stated in pertinent part:

> The parties acknowledge that, with the exception of certain items of personal property, the estate of the parties has been accumulated by the HUSBAND prior to the marriage of the parties. The HUSBAND desires to will virtually all of this estate to the WIFE with the understanding that the WIFE will devise the same upon her death to his children. The WIFE desires to fulfill the HUSBAND's wishes . . .

> The HUSBAND agrees to make a will leaving his entire estate, with the exception of some U.S. Savings Bonds and certain items of personal property, to the WIFE and if the WIFE should predecease him, to his children.

> The WIFE agrees to make a will leaving her entire estate, with the exception of certain personal property, to the HUSBAND and if the HUSBAND should predecease her, to the HUSBAND's children.

> The HUSBAND also agrees that he will execute, deliver and record a Deed to Create Tenants by the Entirety granting the WIFE an undivided one-half interest in his residence located in Manchester, Tennessee.

On the same day, the testator executed a deed to create a tenancy by the entirety in which he conveyed an undivided interest in his residence to Mrs. Cammack.

According to the attorney who assisted the Cammacks in drafting and executing these documents, the testator was aware of the effect of these documents. The lawyer asserted that prior to preparing these documents, he had consulted with the testator and Mrs. Cammack about various legal alternatives that were available to carry out their desires.

The testator died on November 16, 1998 at age 78. Mrs. Cammack was appointed executrix and the will was admitted into probate in January 1999.

In May 1999, the testator's two children filed the underlying petition to establish trust which alleged that Mrs. Cammack was dissipating the estate in violation of her contract with the testator. They claimed that Mrs. Cammack had told them that with the exception of certain items specified in the will, the estate was hers, "to do with as she saw fit." They also alleged that Mrs. Cammack

was in the process of selling the above mentioned residence in spite of the fact that the testator had assured them that he had fixed the paperwork in such a fashion that their step-mother would use the property as long as she lived and then it would pass to them. The two children theorized that although the contract was not worded as such, Mrs. Cammack took a life estate, or held the property in trust for them.

Mrs. Cammack responded by moving for summary judgment. In support of her motion, she provided the affidavit of the attorney who prepared the wills, the contract, and the deed. He attested that:

> During those conversations, we discussed the conveyance of a life estate in real property, including the restrictions that would be imposed upon a life tenant. I specifically discussed with Mr. Cammack that with a life estate that Mrs. Cammack would not be able to sell or give away the property out right [sic] but only her life estate interest and that would insure that his children would have the real property at Mrs. Cammack's death. I further explained to Mr. Cammack that creating a tenancy by the entireties with Mrs. Cammack gave her a present interest in the property and that in the event they were ever divorced, she would be entitled to take a share of it as "marital property" and that without the deed she would have no rights to any share if they were subsequently divorced. I explained to Mr. Cammack that under the Deed to Create Tenancy by the Entireties, Mrs. Cammack would take complete title to the property on his death, no matter what was in the will as her interest would pass under the deed and not the will. Following those discussions, I prepared the deed creating a tenancy by the entirety conveying said property in fee simple . . . During the discussions with Molly M. Cammack and Ralph I. Cammack, I discussed inter vivos trust agreements and testamentary trusts, the limitations and restrictions imposed upon the beneficiary and the Trustee of such a trust. Following those discussions, I prepared and Ralph I. Cammack executed the Last Will and Testament which conveyed his residuary estate to Molly M. Cammack outright without subjecting the same to any trust or other restrictions.

In support of the children's response, the testator's son filed an affidavit in which he attested that Mrs. Cammack had given to her own children "much of the personal property which had great attachment to myself and my sister as well as our parents." He stated:

> I was supposed to pick up some of my tools from my father's shop one day, but before I could get there, one of her sons come and removed all of his [the testator's] expensive woodworking tools and some of my own personal property. . . In addition for example, my parents had an expensive grandfather clock from Germany which had been appraised according to my father several years ago at between $13,000 and $15,000. I inquired what happened to the grandfather clock and she advised me that Kenneth McMurtree (her son) had the clock.

The testator's children argued that because Mrs. Cammack was clearly in breach of the contract, they were entitled to summary judgment. The trial court summarily granted Mrs. Cammack's motion for summary judgment. This appeal ensued.

## I.

Our Supreme Court outlined the standard of review of a motion for summary judgment in *Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83 (Tenn. 2000):

> The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *See Hunter v. Brown,* 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *see Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *See Anderson v. Standard Register Co.,* 857 S.W.2d 555, 559 (Tenn. 1993). The moving party has the burden of proving that its motion satisfies these requirements. *See Downen v. Allstate Ins. Co.,* 811 S.W.2d 523, 524 (Tenn. 1991). When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact. *See Byrd v. Hall,* 847 S.W.2d at 215.
>
> To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. *See McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. *See McCarley v. West Quality Food Serv.*, 960 S.W.2d at 588; *Robinson v. Omer*, 952 S .W.2d at 426. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.
>
> The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v. Hall*,

847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

*Staples*, 15 S.W.3d at 88-89.

In the case before us, there is no dispute of material fact, and each side argues that, based on the undisputed facts, the law entitles it to summary judgment.

II.

The children argue that the evidence demonstrates that Mrs. Cammack breached the contract she made with the testator by dissipating the estate, that the contract was valid and binding, and that they have standing to enforce it as third party beneficiaries.

We agree that the contract is valid and binding. Unfortunately for the testator's children, however, although the contract is binding, nothing therein prevents Mrs. Cammack from selling or distributing items from the estate. The contract required Mrs. Cammack to refrain from changing her will after the testator's death. The record contains no evidence that she breached that promise.

In the contract, the testator agreed to "make a will leaving his entire estate," with certain exceptions, to Mrs. Cammack. The record shows that he did so. The testator's will contains no language restricting Mrs. Cammack's ownership of the estate. The will states:

> With the exception of certain specific items of personal property which I listed and designated the beneficiaries thereof on a writing attached hereto and incorporated herein, I give, devise and bequeath all of the rest, residue and remainder of my estate of whatsoever kind and wheresoever located to my wife, Molly M. Cammack, absolutely and in fee simple.

A conveyance in "fee" or "fee simple" means that the entire property, without limitation has been unconditionally transferred forever. *See, e.g., Grahl v. Davis*, 971 S.W.2d 373, 377 (Tenn. 1998); *Dickson v. Houston*, 221 Tenn. 138, 141, 425 S.W.2d 586, 587 (1968). Thus, the property Mrs. Cammack took under the will is hers.

In the contract, the testator also agreed to execute a deed granting Mrs. Cammack "an undivided one-half interest in his residence." The record shows that the testator then executed a deed creating a tenancy by the entirety in favor of Mrs. Cammack.

A tenancy by the entirety is a form of property ownership unique to married persons. *See Griffin v. Prince*, 632 S.W.2d 532, 534 (Tenn.1982). Its essential characteristic is that "each spouse is seized of the whole or the entirety and not of a share, moiety, or divisible part." *Sloan v. Jones,*

192 Tenn. 400, 402, 241 S.W.2d 506, 507 (1951). Upon the death of one spouse, ownership property held under a tenancy by the entirety immediately vests in the survivor, and the laws of descent and distribution do not apply. *See Grahl v. Davis*, 971 S.W.2d at 378. Thus, at the testator's death, Mrs. Cammack became the sole owner of the residence.

In return for these promises by the testator, Mrs. Cammack promised to execute, and not to change, a will leaving her estate to the testator's children. That will was executed at the same time as the testator's will, and there is no allegation that Mrs. Cammack has attempted to revise or change it. The testator's children argue that the trial court incorrectly interpreted the contract as imposing on Mrs. Cammack only the requirement that she execute and leave unchanged the will. We agree with the children that that is the implied holding of the trial court. However, we also agree with the trial court that that is the correct interpretation of the unambiguous language of the promises made by the parties to the contract.

Because the contract itself is clear and unambiguous and reflects the parties' intent, it must be enforced as written. In *Munford Union Bank v. American Ambassador Cas. Co.*, 15 S.W.3d 448, 451 (Tenn. Ct. App. 1999), this court set out the rules for construction of contracts as follows:

> Contracts . . . are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense. The rule of strict construction does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence (intention) as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties and embodying requirements, compliance with which is made the condition to liability thereon. Neither does the rule prevent the application of the principle that policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties. (citations omitted).

*Munford Union Bank*, 15 S.W.3d at 450 (quoting *Guardian Life Ins. Co. of America v. Richardson*, 23 Tenn. App. 194, 129 S.W.2d 1107 (1939)). "Where there is no ambiguity, it is the duty of the court to apply to the words used their ordinary meaning and neither party is to be favored in their construction." *Munford*, 15 S.W.3d at 451. The ordinary meaning of the language used in the contract herein places no limitations on Mrs. Cammack's ownership of the estate.

The children would have us determine that the introductory language, "Husband desires to will virtually all of his estate to the Wife with the understanding that the Wife will devise the same upon her death to his children. The wife desires to fulfill Husband's wishes . . . " establishes a restriction on Mrs. Cammack's use and disposition of the property she inherited from the testator. Such a reading would be contrary to the express language of the actual promises made in the contract as well as the language of the deed and the two wills.

Moreover, Mrs. Cammack presented evidence showing that the testator chose this means of distributing his estate after considering other options, a fact which demonstrates that his intent to execute the various documents was informed. The lawyer who drafted the contract, the wills, and the deed attested that he discussed the various means of distributing the estate with the testator. The lawyer explained about life estates, *inter vivos* trust agreements, and testamentary trusts, and the testator rejected those options. Thus, even if the testator's children are third party beneficiaries under the contract, enforcing the contract will not prevent Mrs. Cammack from selling or otherwise distributing items from the testator's estate. Nothing in the plain language of the contract restricts Mrs. Cammack's right to sell or otherwise distribute items from the estate.

III.

The testator's children ask the court to impose a resulting trust on the assets of the estate, arguing that such a trust would reflect the intent of the parties.

In *In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993), our Supreme Court adopted the following as a "more comprehensive statement regarding the creation and application of resulting trusts:"

> The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

> While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another - sometimes referred to as a 'purchase- money' resulting trust - they may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust - on an inquiry into the consideration of a transaction - in order to prevent a failure of justice. However, the particular circumstances under which a resulting trust may arise varies from jurisdiction to jurisdiction.

*In re Estate of Nichols*, 856 S.W.2d at 401 (quoting 76 AM.JUR.2d *Trusts* § 166, pp. 197-98 (1992)).

In *Burleson v. McCary*, 753 S.W.2d 349 (Tenn. 1988), the Supreme Court similarly noted the difference between resulting trusts based on the "classic situation" of one person paying a consideration while another takes title and those based on gratuitous transfers. The *Burleson* case involved an ailing father transferring real property by deed to his child to avoid liability of his estate for medical bills with the understanding that the property or its value would be distributed among all his children after his death.[1]

The court stated that the theory of resulting trust in *Burleson* was "one of a failed or frustrated trust" and that the facts fit the situation where "[f]requently, they [resulting trusts] are imposed when the owner of property gratuitously transfers it and properly manifests an intention that the transferee should hold the property in trust, but the trust fails for some technical or evidentiary reason." *Burleson,* 753 S.W.2d at 353 (citing RESTATEMENT (SECOND) OF TRUSTS § 411 (1959) and G. Bogert, TRUSTS AND TRUSTEES § 468 (2d ed. 1977)).

> Resulting trusts and constructive trusts are both created by courts of equity in order to satisfy the demands of justice. One instance when resulting trusts are utilized occurs in a situation where there has been a declaration of an intent to create a trust and the trust, for some reason, has failed. Resulting trusts generally are imposed in accordance with the actual or assumed intention of the parties. *See generally* GIBSON'S SUITS IN CHANCERY §382 (W.H. Inman 6th ed. 1982)

*Burleson*, 753 S.W.2d at 352-53.

Although resulting trusts, by their nature, are normally established by parol evidence, *see Smalling v. Terrell*, 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996), a high standard of proof must be met in order to impose a resulting trust. Our Supreme Court has noted that the creation of a resulting trust is not a means to avoid the law of inheritance of joint tenancies. *See In Re Estate of Nichols*, 856 S.W.2d at 402. The same is true regarding the law of other types of inheritances and conveyances. Only under compelling circumstances may a court impose a resulting trust in contravention of the legal effect of the documents themselves. *See id.* In *Nichols*, the Supreme Court once again adopted the following statement of the high standard of proof upon which a trust may be imposed:

---

[1] The testator's children rely on *Burleson v. McCary* for the proposition that a resulting trust is appropriate. We agree that *Burleson* is relevant to the issues presented in this case because of the type of transactions involved and the court's analysis of resulting trusts, express trusts, and constructive trusts. However, we disagree that *Burleson* supports imposition of a trust in the case before us. In *Burleson* the Supreme Court affirmed the trial court's decision to impose a resulting trust because the weight of the evidence clearly supported the finding that the grantor did not intend for the appellant to receive his residence as her separate property, but that he intended that she either pay his estate the value of the property or reconvey it so that it could be sold and the proceeds equally divided among all of the children at his death. *See Burleson*, 753 S.W.2d at 352. In our case, there is simply no probative proof establishing that the testator intended Mrs. Cammack to hold his estate solely for the use and benefit of his children.

While an implied or resulting trust may be established by parol evidence, yet both upon reason and authority the courts will not enforce it, unless it be established by the most convincing and irrefragable evidence. In other words, it must be sustained by proof of the clearest and most convincing character. To sustain a resulting trust upon parol evidence in the teeth of the terms of the written instrument, it is not essential that the evidence be of a character to remove all reasonable doubt, but only that it be so clear, cogent and convincing as to overcome the opposing evidence, coupled with the presumption that obtains in favor of the written instrument.

*In Re Estate of Nichols,* 856 S.W.2d at 402 (quoting *Estate of Wardell ex rel. Wardell v. Dailey,* 674 S.W.2d 293, 295 (Tenn. Ct. App. 1996) quoting *Savage v. Savage*, 4 Tenn.App. 277, 285 (1927)). The testimony of a single, interested witness typically is insufficient to establish a resulting trust by clear, convincing, and irrefragable evidence. *See King v. Warren,* 680 S.W.2d 459, 461 (Tenn.1984); *Tansil v. Tansil,* 673 S.W.2d 131, 133 (Tenn.1984); *St. Clair v. Evans,* 857 S.W.2d 49, 51 (Tenn. Ct. App.1993).

In the case before us, the testator's children essentially argue that Mrs. Cammack received the real and personal property of her husband, the testator, only to hold for the benefit of the testator's children, in spite of the language of his will devising his residual estate "absolutely and in fee simple" and in spite of the deed creating a tenancy by the entirety. They rely on two pieces of evidence to support their argument for imposition of a trust. The first is the language of the contract, "The HUSBAND desires to will virtually all of this estate to the WIFE with the understanding that the WIFE will devise the same upon her death to his children. The WIFE desires to fulfill the HUSBAND's wishes." The second is the affidavit of the testator's son, which states in pertinent part:

After my mother's death and then the subsequent remarriage of my father, he told me that he wanted to see that his new wife was cared for, but that all the property that had been acquired by he and my mother, would end up with my sister and me after her death. He told me that he had made arrangements and fixed papers where his wife would have use of all his property while she was living and then at her death, it would all come to my sister and myself.

This is insufficient evidence on which to determine that the intent of the testator and Mrs. Cammack was for her to hold the testator's estate solely in trust for his children in light of the language of the documents disposing of the estate and in light of the other parol evidence, the affidavit of the lawyer who advised the testator. That attorney explained to the testator various methods for achieving the results that the children now argue he intended, but the testator chose not to employ any of them. While the testator obviously hoped his widow would follow his wishes regarding the property he had acquired with his children's mother, he specifically refrained from imposing limitations on her use of his estate.

The testator's expression of his wishes in the contract could be considered "precatory words." The question in such situations is generally did "the testator intend to impose a binding obligation on the devisee to carry out his wishes, or did he mean to leave it to the devisee to act or not at his own discretion." *Spicer v. Wright*, 211 S.E.2d 79, 81 (Va. 1975) (quoting *Smith v. Baptist Orphanage*, 194 Va. 901, 905, 75 S.E.2d 491, 494 (1953)). We think the evidence clearly indicates the testator's choice not to impose a legally binding obligation on Mrs. Cammack to keep his estate intact during her lifetime. Absent language or acts creating a legally binding obligation, the only obligation created by the testator's wishes is a moral one, something this court is not empowered to enforce.

Thus, we conclude that the evidence the testator's children have presented is not so clear, cogent and convincing as to overcome the opposing evidence or to present a set of compelling circumstances to justify establishment of a trust. Nor can we say that the imposition of a resulting trust would be equitable. The evidence does not support a finding that the testator would have approved of the imposition of a resulting trust. On the contrary, the record shows that his attorney offered him the option of imposing a trust on the assets of his estate and of providing his widow with a life estate in the property. He chose instead to execute a deed establishing a tenancy by the entirety on behalf Mrs. Cammack, with full knowledge that such would empower her to sell or distribute the property. He executed a will leaving her his remainder estate absolutely.

Accordingly, the trial court's decision to grant Mrs. Cammack's motion for summary judgment is affirmed. This case is remanded for any further proceedings which may be necessary. Costs of this appeal are taxed to the appellants, Polly Ann Cammack Travis and Fred Cammack.

_____
PATRICIA J. COTTRELL, JUDGE